UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In Re: | Chapter 15 |
| MIRROR TRADING INTERNATIONAL (PTY) LTD, | Case No.: 23−11046−PDR |
| Debtor in a Foreign Proceeding _____/ | |
| | Adv. Pro. No. 24-01152-PDR |
| CHAVONNES BADENHORST ST CLAIR COOPER, in her capacity as the Foreign Representative of Mirror Trading International (PTY) Ltd, | |
| Plaintiff, | |
| v. | |
| ANDREW MEIER, | |
| Defendant. | |
| _____/ | |

**FOREIGN REPRESENTATIVE'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Chavonnes Badenhorst St Clair Cooper (the "Liquidator"), as one of the duly appointed liquidators of the bankruptcy estate of Mirror Trading International (PTY) Ltd (the "Foreign Representative" or "Plaintiff") files this response ("Response") in opposition to the Motion for Judgment on the Pleadings (the "Motion") [D.E. 12] filed by Defendant ANDREW MEIER ("Defendant"). In support of the Response, the Plaintiff states as follows:

1.      The Complaint sets out a description of the pyramid/ponzi scheme perpetrated by the foreign debtor.  The claims asserted are for recovery of "net winnings" (Section 26 claim in count I) and/or preferential transfers (Section 29 and 30 claims in counts II and III).

## I.      The Defendant is not entitled to Judgment as a Matter of Law.

### A.   Defendant's "Net Loser" Argument

2.      Defendant seeks entry of judgment in his favor alleging he is a Class 1 Investor based on his interpretation of Exhibit A to the Complaint, and accordingly, the Plaintiff failed to state "any" cause of action against the Defendant. D.E. 12 at p.8.  In support of this argument, Defendant does not dispute his involvement with the Debtor nor the fact that at some point in time he received more bitcoin than he originally contributed.  Rather, Defendant claims he reinvested additional bitcoin after receiving from MTI more bitcoin than he originally put in ("Subsequent Investment Argument") ultimately lost all that additional bitcoin when the Debtor collapsed and is entitled to have the additional bitcoin count towards whether he was a net loser or a net winner (Class 2 or Class 3 in the parlance of the Complaint).

3.      As the Court is aware, the Plaintiff is amending the Complaint to address certain errors and pleading deficiencies raised by other Defendants. This Court granted Plaintiff leave to amend all adversary complaints, including as to this Defendant. *See* D.E. 14.  Defendant's Motion raises arguments similar to those raised by other Defendants, which the Plaintiff will address and/or cure in its amended complaint.

4.      Specifically with regard to Defendant's Subsequent Investment Argument, the amended complaint will make more explicit the allegation and position of Plaintiff that any bitcoin reinvested by the Defendant with the Debtor after receiving net winnings does not constitute value given in exchange for the bitcoin amount previously received in excess of the original investment.

The amended complaint will also correct errors suggesting that only Class 3 Investors have exposure for preferential transfers, which is not the case, and which Defendant's Motion bases certain arguments on. *See* Estate Claims Order, §§ 4.2.7, 4.2.8 (D.E. 319, at p. 145).

**B.  Defendant's Section 26 Argument**

5.      In his section-specific portion of the Motion, Defendant raises a "custodian" argument. Defendant argues that the Debtor never had "any rights to or ownership interest in any of the Bitcoins it came into possession of…Thus, any Bitcoin the Defendant received was property of a third party and not that of the Debtor." D.E. 12 at p.10.

6.      For this argument to work, the Debtor would have to have been operating as a "custodian" of the Defendant's bitcoin—merely a depository for the Defendant to store his bitcoin. However, the Plaintiff has plainly and repeatedly alleged in its Complaint that the Debtor was not a custodian of the investors' bitcoin, but rather an investment vehicle for the investors. *See* D.E. 1, at ¶¶ 4, 18, 20, 30. This Court is aware of this "custodian" argument from recent hearings in other adversaries.  However, for the avoidance of any doubt, Plaintiff's amended complaint will specifically assert the non-custodial nature of the Debtor's operation as relating to the MTI Investors.

7.      Furthermore, to the extent the Defendant disputes the insolvency of the Debtor at the time of the dispositions to the Defendant (D.E. 12 at p. 11), such issue is certainly a material fact in dispute that would preclude entry of judgment in Defendant's favor. Defendant's argument that the fact that Defendant was able to make withdrawals from the Debtor on certain dates "supports the inference that the Debtor was *not* insolvent at that time[]" is at most just that—an inference, and not a fact that would support entry of judgment.  In reality, such argument is merely a denial of the Plaintiff's allegation of insolvency.

**C.  Defendant's Section 29 Argument**

8.      Defendant's Section 29 argument is essentially Defendant's affirmative defenses to such a claim under South African law. Specifically, Defendant claims the dispositions received from the Debtor were made in the ordinary course of business. In support for his argument, Defendant relies on an article published in South Africa commenting on South African case law relating to dispositions under Section 29. See D.E. 12, at p. 12 (citing Mabe Z "Setting aside Transactions from Pyramid Schemes as Impeachable Dispositions under South African Insolvency Legislation" *PER/ PELJ* 2016(19) – DOI ("Mabe Article")). Interestingly, Defendant also references the South African case *Griffiths v. Janse van Rensburg* but relies on the Mabe Article, not the holding in the case, for the proposition that an investor who raises a "*condictio*" argument[1] will be successful in establishing an ordinary course of business defense to a Section 29 claim. A copy of *Griffiths v. Janse van Rensburg NO* (20269/2014) [2015] ZASCA 158 (26 October 2015) is attached hereto as **Exhibit 1**.  A review of that decision reveals that *Griffiths* directly contradicts Defendant's argument here.

9.      The Complaint sets out the entirety of Section 29 of the Insolvency Act:

> *Section 29- Voidable preferences*
>
> *Every disposition of his property made by a debtor not more than six months before the sequestration of his estate or, if he is deceased and his estate is insolvent, before his death, which has had the effect of preferring one of his creditors above another, may be set aside by the Court if immediately after the making of such disposition the liabilities of the debtor exceeded the value of his assets, unless the person in whose favour the disposition was made proves that the disposition was made in the ordinary course of business and that it was not intended to thereby to prefer one creditor over another.*

---

[1] *Condictio ob turpem vel iniustam causam ("condictio")* is an unjustified enrichment claim based on the fact that the amount claimed was transferred pursuant to an agreement that is void and unenforceable cause it is illegal. *See* Mabe Article, at fn. 54.

10.    Section 29 lays out the elements of the cause of action, and then recites the affirmative defenses available to a transferee seeking to retain the disposition. However, the Plaintiff need only plead the elements of the claim—it need not preemptively plead that the disposition was not in the ordinary course. It is the transferee's onus to establish its alleged ordinary course affirmative defense.

11.    The *Griffiths* Court did discuss *condictio* as a valid right to receive a disposition and indicated that if a transferee had demanded and received the return of their investment, such fact pattern could support an ordinary course defense under Section 29. Specifically, the *Griffiths* Court stated: "It is not open to Mr Griffiths to argue that, if he had invoked condictio, the payments would have been made in the ordinary course. **On a factual level**, he did not do so." *Griffiths*, at ¶ 28 (emphasis added). That court ultimately held that the dispositions -- even as characterized as "return of capital" -- were correctly set aside by the trial court under Section 29 of the Insolvency Act

12.    Contrary to the Defendant's argument in the Motion, the transferee in *Griffiths* did not lose on appeal because he had failed to plead *condictio* in the post-hoc litigation regarding the transfer, he lost because "on a factual level" he did not receive the payments under a demand for *condictio.*

13.    Here, Defendant does not and cannot assert "on a factual level" he received bitcoin in response to a demand for *condictio*. Contrary to a factual scenario where Defendant asked for or received his investment back on account of the underlying transaction being illegal, Defendant readily acknowledges that he received from MTI an amount of bitcoin that **exceeded** the amount of bitcoin he "invested" with MTI prior to re-investing additional bitcoin shortly before MTI's collapse.

D. **Defendant's Section 30 Argument**

14.     Defendant's Section 30 argument focuses on the intent of the Debtor's principal, Steynberg, to prefer Defendant over the Debtor's other creditors as being an essential element of a Section 30 Claim under South African law. Defendant further argues that the Complaint does not contain allegations of intent for purposes of Section 30. Defendant's assertions are incorrect.

15.     The Complaint sets out the entirety of Section 30 of the Insolvency Act:

> **Section 30 – Undue preference to creditors**
>
> (1) *If a debtor made a disposition of his property at a time when his liabilities exceeded his assets, with the intention of preferring one of his creditors above another, and his estate is thereafter sequestrated, the court may set aside the disposition.*
> (2) *For the purposes of this section and of section twenty-nine a surety for the debtor and a person in a position by law analogous to that of a surety shall be deemed to be creditor of the debtor concerned.*

16.     The Complaint also contains allegations of the Debtor's intent to prefer Defendant over its other creditors. *See* D.E. 1, ¶61(b).

17.     Defendant claims that the Complaint is deficient because it does not identify Mr. Steynberg as the person who intended the preference.  But Defendant cites no legal authority that Section 30 requires pleading or even proof of the intent of a specific representative, agent, or employee of "the debtor" to sustain a claim under Section 30.  Nothing in the statute – which speaks in terms of "the debtor" – reveals such an obligation.

18.     Building from the false premise that Plaintiff needed to identify the specific representative, agent, or employee of the debtor who had the requisite intent, Defendant then argues that such individual is a necessary (indeed not just necessary, but indispensable) party under Fed. R. Civ. P. 19. Again, Defendant cites no South African case or legal authority for this

proposition that the representative of a debtor is a necessary party under Section 30 because his/her intent may be relevant to the inquiry.

19.     Fed.R.Civ.P. 19, as incorporated by Fed.R.Bankr.P. 7019, requires a showing that either the court could not afford complete relief to the parties without the presence of the un-named person or that the un-named person "claims an interest relating to the subject of the action" that proceeding without them prevents the protection of that interest or exposes an existing party to a substantial risk of incurring doubt, multiple, or otherwise inconsistent obligations because of the interest of the un-named person.

20.     Here, the Complaint (and soon to be filed Amended Complaint) will seek no relief from MTI (the transferor).  Plaintiff seeks relief only from Defendant for the return of the inappropriately transferred property or an amount of money if the property cannot be returned. That complete relief can be awarded without MTI or its former principal as parties.  In his Motion, Defendant makes no assertion that he has some other obligation to or from MTI or its former principal.

21.     Generally speaking, transferors from whom no relief is sought in a complaint, are not necessary parties.  *In re Silverman*, 603 B.R. 498, 502 (Bankr. D.N.M. 2019) ("Case law makes clear that the transferor is not a necessary party to an avoidance action brought against the transferee if the transferor did not retain any interest in the transferred property."). *See also In re Hopkins,* 494 B.R. 306, 314-21 (Bankr. E.D. Tenn. 2013) (transferor who retained no interest in the transferred property is not a necessary party); *Chase Bank USA N.A. v. Jacucci*, 2020 WL 6870871, *4 (S.D. Fla. June 5, 2020) (transferor is not a 'necessary party' in an action for avoidance against a transferee); *Meininger v. Euram, LLC (In re Land Res., LLC), 2011 Bankr.*

*LEXIS 5491, *11* (Bankr. M.D. Fla. Aug. 5, 2011) (trustee can sue subsequent transferee without naming initial transferee as party).

22.      Last, Defendant's motion makes a passing reference to a defense based on personal jurisdiction and/or venue. *See* D.E. 12 at p. 5. As to personal jurisdiction, the Defendant was served by mail in the United States.  And, there is no contention that the Defendant does not reside in the United States. Accordingly, this Court has personal jurisdiction over the Defendant. *See In re: Bumshteyn*, 2022 WL 126612 (Bankr.S.D. Fla. January 13, 2022) (Russin, J.).  As to venue, 28 U.S.C. 1409(a) provides for proper venue in this district.

**WHEREFORE**, Plaintiff respectfully requests this Court enter an order (a) denying Defendant's Motion for Judgment on the Pleadings, (b) re-affirming its grant of leave to Plaintiff to amend the complaint, and (c) granting such other and further relief as the Court deems just and equitable.

Dated: June 10, 2024                         Respectfully submitted,

                                              **SEQUOR LAW, P.A.**
                                              1111 Brickell Avenue, Suite 1250
                                              Miami, Florida 33131
                                              Telephone: (305) 372-8282
                                              Facsimile: (305) 372-8202

                         By:      */s/ Maria J. Cortesi*
                                              Gregory S. Grossman, FBN 896667
                                              ggrossman@sequorlaw.com
                                              Maria Jose Cortesi, FBN 1024946
                                              mcortesi@sequorlaw.com

                                              **REDMOND LAW FIRM, LLC**
                                              Christopher J. Redmond
                                              Kansas Bar No. 7307
                                              13220 Metcalf, Suite 310
                                              Overland Park, Kansas 66213
                                              Tel:  (913) 379-1100
                                              Christopher.Redmond@christopherredmondlawf
                                              irm.com
                                              *Admitted Pro Hac Vice*

# **<u>EXHIBIT 1</u>**



**THE SUPREME COURT OF APPEAL OF SOUTH AFRICA**

**JUDGMENT**

**Reportable**

Case No: 20269/2014

In the matter between:

**JONATHAN BRIAN GRIFFITHS**                    **APPELLANT**

**and**

**JACOBUS HENDRIKUS
JANSE VAN RENSBURG NO**               **FIRST RESPONDENT**

**ROMANA BERNADETTE KNUTH NO**        **SECOND RESPONDENT**

**Neutral citation:**  *Griffiths v Janse van Rensburg NO* (20269/2014) [2015]
ZASCA 158 (26 October 2015)

**Coram:**          Shongwe, Pillay, Petse and Saldulker JJA and Gorven AJA

**Heard**:          **1 September 2015**

**Delivered:**       **26 October 2015**

**Summary:** Insolvency ─ dispositions ─ requirement in s 29 of the Insolvency
Act that dispositions must be made in the ordinary course of business ─ broad
test restated and applied ─ dispositions made pursuant to void contracts ─ test
not satisfied ─ dispositions correctly set aside ─ *mora* interest on an award
setting aside such disposition under s 32(3) of the Insolvency Act ─ debt arises
only on judgment ─ no amount due before judgment on which *mora* interest can
run ─ *mora* interest to run only from date of judgment.

---

## ORDER

---

**On appeal from:** Eastern Cape Local Division of the High Court, Port Elizabeth (Brooks AJ sitting as court of first instance), judgment reported *sub nom Janse van Rensburg NO & another v Griffiths* [2014] 2 All SA 670 (ECP).

1 The appeal is dismissed with costs.
2 The cross-appeal is dismissed with costs.

---

## JUDGMENT

---

**Gorven AJA (Shongwe, Pillay and Saldulker JJA concurring):**

[1]     This matter concerns four payments made to the appellant (Mr Griffiths) by the Usapho Trust (the Trust), which was established in terms of the Trust Properties Control Act.[1] The payments followed two agreements to make what the parties termed, and I shall term, investments with the Trust. These were, in law, contracts of loan. The Trust was the vehicle through which Maureen Clifford and her associates operated a pyramid scheme. The investments were made in the scheme, which later collapsed. The Trust was sequestrated on 24 September 2000. The respondents are the trustees in insolvency of the Trust. I shall refer to them as the trustees. To avoid confusion, I shall refer to actions of the trustees appointed under the Trust Property Control Act to administer the Trust and who did so prior to sequestration as actions of the Trust.[2] Ms Clifford and others were convicted in a criminal trial which followed the sequestration.

---

[1] Trust Property Control Act 57 of 1988.
[2] This is not strictly accurate since, except where provided for by Statute, a trust is not a legal person. '[I]t is an accumulation of assets and liabilities' which vest in the trustees. A trust estate can therefore only act through the trustees. *Land and Agricultural Bank of South Africa v Parker & others* 2005 (2) SA 77 (SCA) para 10.

In the court below, the trustees brought an action which included a claim based on s 29 of the Insolvency Act (the Act)[3] to set aside the four payments made to Mr Griffiths.

[2]    Section 29(1) reads as follows:

'Every disposition of his property made by a debtor not more than six months before the sequestration of his estate or, if he is deceased and his estate is insolvent, before his death, which has had the effect of preferring one of his creditors above another, may be set aside by the Court if immediately after the making of such disposition the liabilities of the debtor exceeded the value of his assets, *unless* the person in whose favour the disposition was made proves that the disposition was made in the ordinary course of business and that it was not intended thereby to prefer one creditor above another.'[4]

The onus to prove all the issues dealt with in this section up to the proviso introduced by the word 'unless', rests on the party attempting to set aside the disposition. If this onus is discharged, the onus then shifts to the person wishing to retain the disposition to prove the last two issues.

[3]    After a number of conferences were held in terms of rule 37 of the Uniform Rules of Court, the following matters were agreed. The payments were dispositions by the Trust. They were made less than six months before the Trust was sequestrated. The payments had the effect of preferring Mr Griffiths above other creditors. After each of the payments was made, the liabilities of the Trust exceeded its assets. Agreement on these matters had the effect of discharging the onus on all of the issues required to be proved by the trustees.

[4]    The onus thus shifted to Mr Griffiths to prove both components of the proviso. These were that the dispositions were made in the ordinary course of business and that when the payments were made there was no intention to prefer

---

[3] Insolvency Act 24 of 1936.
[4] My emphasis.

Mr Griffiths over other creditors. The trustees admitted the second of these. Accordingly, the only remaining issue at the trial was whether the payments were made in the ordinary course of business.

[5]    It is necessary to set out the relevant facts concerning the payments. Mr Griffiths made two investments of R100 000 each. The first was made on 15 December 1999. As seems to be customary in pyramid schemes, the first loan was repaid on the due date of 23 March 2000. It was paid by a cheque in the sum of R100 000 drawn on the account of the Trust and deposited by Mr Griffiths into his account on 27 March 2000. Along with that payment, an amount of R12 000 was paid in cash in respect of agreed interest. This amounted to interest at a rate slightly higher than 42 percent per annum.  The second investment was made by Mr Griffiths on 6 April 2000. That was repaid on 3 June 2000, three days after the agreed date. The capital of R100 000 was deposited by the Trust into the account of Mr Griffiths. Here, too, he was separately paid cash of R12 000 in respect of agreed interest. This amounted to interest at a rate higher than 74 percent per annum.

[6]    The following was also agreed. The business being carried on by the Trust prior to its sequestration was that of a pyramid scheme. The investments were occasioned by the false and fraudulent representations of Ms Clifford and her associates, who acted on behalf of the Trust. These included representations to the effect that the scheme was viable, lawful, not in contravention of any statutory or regulatory provisions, not a pyramid scheme and that the deposits would be utilised by the Trust to purchase from certain estate agents their rights to commissions which had been earned but not yet paid. These rights would be purchased from the estate agents at a premium relative to the commissions to be earned. The Trust would thus earn sufficient profits to enable it to repay the investments and the agreed interest at rates which were, in certain cases,

usurious. However, Ms Clifford and her associates were aware that the investments would be used to fund repayment to other investors together with interest thereon. It was admitted that the scheme was unlawful as being a pyramid scheme, that the business contravened the provisions of s 11(1) of the Banks Act[5] and that it constituted a harmful business practice as envisaged in paragraph 2 read with paragraph 1.1 of the notice[6] in terms of s 12(6)(iii) of the Consumer Affairs (Unfair Business Practices) Act.[7]

[7]    At the trial the parties agreed that a transcript of the evidence led in the criminal trial could be admitted as evidence without formal proof. This also applied to a transcript of the evidence given by Mr Griffiths at an insolvency enquiry before the Master. In his evidence Mr Griffiths testified that he had been referred to the Trust by a bank employee. He never actually met any of the people involved. When he had contact with a person representing the Trust, he was told to deposit R100 000 into a particular bank account and that he would receive R12 000 in interest after three months. He struggled to obtain payment on both occasions. For the first investment, he received no documentation. For the second, he obtained an acknowledgement of debt which was only issued to him after he had applied 'considerable duress'. Although he did not know the details of the scheme, he was aware that it had something to do with estate agents and, as he put it, decided to take a chance.

[8]    In the particulars of claim, the trustees pleaded, and it was admitted, that there were four separate dispositions: two of capital and two of interest. The trustees alleged that Mr Griffiths was a creditor of the Trust and that the dispositions in question should be set aside. His plea was to the effect that he

---

[5] Banks Act 94 of 1990.
[6] Notice 1135 of 1999 in *Government Gazette* No. 20169 of 9 June 1999.
[7] Consumer Affairs (Unfair Business Practices) Act 71 of 1988. This was repealed by the Consumer Protection Act 68 of 2008 but was in operation whilst the scheme was being conducted.

was a creditor '. . . based on an enrichment cause of action against the Usapho Trust for repayment of capital monies paid to such trust by the Defendant in terms of an illegal and void agreement (alternatively agreements).' He went on to plead that the Trust had a legal obligation to repay the amounts because the agreements were void and illegal and that the obligation to repay arose when Mr Griffiths made the investment payments.

[9]    Although the effect of the plea is that all four of the impugned dispositions were made in the ordinary course of business, it was conceded on appeal that this was not true of the two amounts of R12 000 representing interest. Mr Griffiths accordingly acceded to an order setting these aside. What thus remained in issue before us was whether Mr Griffiths proved that the two dispositions of capital were made in the ordinary course of business and should thus avoid the same fate. Since there is no issue relating to the interest amounts, the payments of the two capital sums will henceforth simply be referred to as the dispositions.

[10]    Brooks AJ in the Eastern Cape Local Division, Port Elizabeth, found that neither the dispositions nor the interest payments had been made in the ordinary course of business. He set all four dispositions aside and ordered Mr Griffiths to pay R224 000 along with interest from the date of judgment and costs. This appeal is with his leave as is also the cross-appeal against his failure to order interest to run from the date of service of the summons rather than from the date of judgment.

[11]    There has been much judicial comment on what is meant by the phrase 'the ordinary course of business'. It is not necessary to rehearse all of it. This court has been consistent over many years in the test to be applied. The test is an objective one. The disposition should be evaluated in the light of all relevant

facts. This must be done on a case by case basis. Put traditionally, the disposition '. . . must be one which would not to the ordinary [person] of business appear anomalous or unbusinesslike or surprising.'[8] The question is whether ordinary, solvent, businesspeople would, in similar circumstances, themselves act as did the parties to the transaction.[9] Consideration should not be given to any intention to prefer or to the fact that the party making the disposition was insolvent at the time since these are considered separately under other parts of the section.[10] The question to be answered is whether the transaction is one 'with conventional terms which ordinary businesspeople would normally have concluded under the given circumstances'.[11] In other words, the disposition in question should not cause wrinkled noses or raised eyebrows among solvent businesspeople who know the circumstances in which it was made.

[12]   The most recent judgment of this court dealing with the issue is *Gazit Properties v Botha & others NNO*.[12] In that matter, the principles summarised above were accepted and some of the dicta were referred to. Despite this, the trustees submitted in the court below, and in this court, that *Gazit Properties* narrowed the test accepted by this court over the years. They submitted that '. . . it appeared to apply a narrow test requiring a close scrutiny of the disposition in question there, viewed against the background of its *causa* – this despite earlier in the judgment referring with approval to the strong authority, emanating from this honourable court, espousing a broad test.'

---

[8] *Malherbe's Trustee v Dinner & others* 1922 OPD 18 at 22.
[9] *Hendriks NO v Swanepoel* 1962 (4) SA 338 (A) at 345A-346A.
[10] See *Hendriks* at 342F-H and 345A-B.
[11] My translation of the dictum of FA Grosskopf JA in *Amalgamated Banks of South Africa Beperk v De Goede & 'n ander* [1997] ZASCA 30; 1997 (4) SA 66 (SCA) at 78C-D: holding that the transaction there met the test because it was one 'met gebruiklike terme wat gewone besigheidsmense normaalweg onder die gegewe omstandighede sou aangegaan het.'
[12] *Gazit Properties v Botha & others NNO* [2011] ZASCA 199; 2012 (2) SA 306 (SCA).

[13]   The salient facts in *Gazit Properties* were as follows. A company, Malokiba Trading 19 (Pty) Ltd, which contravened the Banks Act by procuring loans from the public without being registered as a bank, had borrowed money from Gazit Properties. Under the loan, Gazit Properties would be paid interest of 2,5 percent of the loan capital monthly. The agreement would remain in force indefinitely but, after three months, could be cancelled by either party on 45 days' notice. Gazit Properties gave the requisite notice and demanded repayment, whereupon the capital and interest was paid. In contending that the disposition had not been made in the ordinary course of business, the liquidators originally relied on contentions that the business was irregular in three respects: it contravened the Banks Act; it constituted a prohibited pyramid scheme; and the interest rate paid was usurious. They ultimately relied only on the contravention of the Banks Act.

[14]   The trial court in that matter upheld the contentions of the liquidators, which 'laid heavy emphasis on the fundamental contamination . . . of the transaction whereby Malokiba repaid the loans'. In essence, the trial court there found that a 'tainted' business model of necessity had the result that no dispositions of that business could be said to have been made in the ordinary course of business.[13] This court disagreed. Whilst accepting that the scheme contravened the Banks Act, it held that Malokiba had made the payments in accordance with its obligations arising from valid loan agreements.[14] This accords with the approach over the years that:

'. . . [I]t must necessarily be a paramount principle of "business" that . . . debts should be paid according to the tenour of the contract.'[15]

---

[13] *Gazit Properties* para 7.
[14] Ibid para 9.
[15] *Fourie's Trustee v Van Rhijn* 1922 OPD 1 at 5, approved in the minority judgment in *Hendriks* at 343A-D.

[15]   In the present matter, Brooks AJ held that *Gazit Properties* had applied the well-worn broad test. I agree with this. In my view, the submission that it narrowed the test accepted by this court over the years holds no water.

[16]   Brooks AJ went on to distinguish the facts in the present matter from those in *Gazit Properties*. This was correct because the investment agreements in the present matter were illegal and void whereas the loan in *Gazit Properties* was valid and enforceable. However, he went on to find that, because of the 'illegality of the business operations, the manner in which participation therein was secured and the exorbitant returns on "*investment*" alone',[16] the dispositions were not made in the ordinary course of business. In this he relied on a dictum that for a disposition to be made in the ordinary course of business, it must be 'a lawful or valid disposition made in the ordinary course of lawful business'. [17]

[17]   In my view, this dictum goes too far and fails to appreciate the true focus of the enquiry. The need for a lawful disposition is uncontroversial. It is clear that ordinary, solvent people of business do not conclude unlawful agreements, or attempt to obtain unlawful dispositions. But when it comes to a requirement that the disposition must be made in the course of a lawful business, I cannot agree. The inadequacy of this approach may be illustrated by the following example. In the present matter, the Trust was conducting an unlawful business. If, as is possible, the Trust had leased premises and concluded an agreement with the municipality for the provision of electricity, water and other services, it could hardly be contended that all payments of rental to the landlord and those under the agreement with the municipality would be impeachable as not having been made in the ordinary course of business.

---

[16] Paragraph 31, his emphasis.
[17] Per Scott AJ in *Klerck NO v Kaye* 1989 (3) SA 669 (C) at 676B-D.

[18]   It seems to me that what the cases primarily focus on, and what was overlooked in *Klerck v Kaye*, is the nature of the business relationship between the insolvent and the recipient at the time the disposition was made, rather than the general nature of the business undertaken by the insolvent. Thus, in *Gazit Properties*, although the manner in which the business in question was conducted fell foul of the Banks Act, the relationship between the parties was one constituted by an enforceable contract of loan. The disposition was the repayment of the loan in accordance with the terms of the contract. Ordinary, solvent, businesspeople would not shrink from such a transaction.

[19]   Case law lends support to this approach. Two examples of dispositions that failed the test will be referred to.[18] *Estate Wege v Strauss*[19] dealt with the business of a bookmaker. A debt to a bookmaker was held not to be illegal but could not be enforced in court.[20] The bookmaker normally required immediate repayment of a betting debt but allowed debts of the insolvent to stand over for an indefinite period. When the insolvent paid the debt, this court held:

'It is not in the ordinary course of a bookmaker's business to allow the settlement of debts due by a client to stand over for an unlimited period. If this is done, and a client whose liabilities exceed his assets pays a betting debt long overdue, he does not do so in the ordinary course of betting business . . .'.[21]

What is apparent from this passage is that had the payment been made immediately, which is the ordinary requirement of the business relationship between a bookmaker and a client, it would have been accepted as having been made in the ordinary course of business. Payment of a debt is, after all, what is ordinarily required by a business. In view of the particular business relationship

---

[18] There are numerous similar examples of judgments which focus on the particular business relationship. See *Hendriks* (above note 7); *Jacobson and Co's Trustees v Jacobson and Co* 1920 AD 75; *Zeeman v Botha's Trustee* 1923 AD 167.
[19] *Estate Wege v Strauss* 1932 AD 76.
[20] Ibid at 81.
[21] Ibid at 85.

between the bookmaker and the insolvent, however, it was held that the payment in question was not made in the ordinary course.

[20]   In similar fashion, in *Paterson NO v Trust Bank of Africa Ltd*,[22] an insolvent attorney, a potential purchaser of his practice and a banker concluded an agreement whereby the banker granted an overdraft facility to the purchaser to provide the funds to purchase the practice. The overdraft facility was granted on condition that the funds went into the overdrawn account of the insolvent attorney held with the bank in question. This court accepted that a tripartite agreement was, at face value, a normal banking transaction. The question was whether the clause in the agreement requiring that the funds loaned to the purchaser be paid into the insolvent's overdrawn account, was a clause arising in the normal course of business. This court held that it was not. The disposal of the practice was therefore set aside.

[21]   The court below accordingly erred in applying the dictum in *Klerck v Kaye*. This caused it to focus on the general nature of the business conducted by the Trust. It therefore failed to fully analyse and to give due weight to the relationship between Mr Griffiths and the Trust. As a result, it also misconstrued the basis on which Mr Griffiths contended that he was entitled to retain the two capital sums forming the dispositions.

[22]   In *Fourie NO & others v Edeling NO & others*,[23] it was held, in relation to such a scheme:

'All loans made to the scheme were – in the light of at least the provisions of section 11 of the Banks Act 94 of 1990 and a prohibition under the Consumer Affairs (Unfair

---

[22] *Paterson NO v Trust Bank of Africa Ltd* 1979 (4) SA 992 (A).
[23] *Fourie NO & others v Edeling NO & others* [2004] ZASCA 28; [2005] 4 All SA 393 (SCA).

Business Practices) Act 71 of 1988 – illegal and therefore void; this proposition of law is uncontested.'[24]

The agreement by the parties to this matter, that the investments were illegal and void, accords with that dictum. In those circumstances, '[t]he scheme never had the least entitlement to retain investors' money until the date which had supposedly been agreed as the due date for repayment.'[25] In *Gazit Properties*, over and above its finding that the payment was made in terms of the loan agreement and therefore in the ordinary course of business, this court said that if the loans in that matter had been void 'the money had to be repaid by the company on demand'.[26] That is in principle correct. Where payments are made pursuant to void agreements, a claim for repayment would ordinarily lie under the *condictio ob turpem vel iniustam causam*, which is one of the enrichment actions.

[23]  Mr Griffiths submitted that the dictum in *Gazit Properties* applies foursquare to the facts of the present matter. As was clear from the plea, Mr Griffiths contended that he was a creditor of the Trust by virtue of the *condictio*. He disavowed being a creditor pursuant to the investment agreements. He submitted that, on the basis of the *condictio*, the claims would have lain against the Trust for immediate repayment of the two capital sums.

[24]  On the face of it, the only defence to such an action would have been if it were shown that Mr Griffiths had acted *ex turpi causa* and if the court declined to relax the rule *in pari delicto potior est conditio defendentis*. It is by no means self-evident that a person in Mr Griffiths' place would have been aware of the illegality. As has been stated, such schemes attract investors because 'history . . . teaches us that in the human breast greed and gullibility are often

---

[24] Ibid para 13.
[25] Loc cit.
[26] *Gazit Properties* para 11.

partners. It is on these twin weaknesses that all confidence-tricksters trade; and not a few flourish.'[27] The trustees readily conceded that there was no evidence that Mr Griffiths acted *ex turpi causa* or had any knowledge that the investments were tainted. The trustees did not seek to advance the case that Mr Griffiths knew that the transactions were unlawful either in the court below or in this court. There is therefore no issue concerning the relaxation of the *par delictum* rule.

[25]   Would a payment under the *condictio* qualify as one which was made in the ordinary course of business? I am prepared to accept for present purposes that had he made claims under the *condictio* they would have been enforceable. Such claims would have arisen at the time that he made each of the investments. If the directors of a company discover that employees are conducting a pyramid scheme along with other legitimate business, the duty of the directors would be to immediately halt the scheme and repay the amounts received pursuant to it. Similarly, if a person has invested in an unlawful scheme and discovered this fact the natural reaction would be to demand repayment of their investment, not in terms of the unlawful scheme but under the *condictio*. If repayments were made in those circumstances they would be dispositions arising from lawful, enforceable, obligations on the part of the company to the investors in the scheme. To my mind, ordinary, solvent, businesspeople, aware of the illegality of the loans, would have seen nothing extraordinary or untoward about a repayment on the basis of the *condictio* – indeed, they would have expected it.

[26]   Mr Griffiths accepted that, if the capital and interest had been paid together in a single payment, a single disposition would have been made which would not have been enforceable under the *condictio*. He did so because the

---

[27] *Commissioner for Inland Revenue v Insolvent Estate Botha t/a 'Trio Kulture'* [1990] ZASCA 2; 1990 (2) SA 548 (A) at 554D-E.

dispositions relating to interest were made without any legally enforceable obligation for the Trust to make them. They could not fall under the *conditio* and could only have derived from the void investment agreements. The submission as regards the interest is correct, but illustrates the fallacy of Mr Griffiths' approach. He focuses on what, properly conceived, might have been a lawful basis for the dispositions if he had invoked it. In doing so he ignores and thereby seeks to avoid the true basis upon which the payments were actually made.

[27]   The focus, however, must be on the dispositions themselves. As was said in *Fourie's Trustee v Van Rhijn*:[28]

> 'The disposition is either in the ordinary course of business, or it is not; the standard is a concrete and objective one, and it has regard to the "disposition." The disposition is the transaction taking place between payor and payee'.

In regarding the dispositions, a court looks at the 'substance and not the mere description of the transaction'.[29]

[28]   What, then, were the 'transactions' which took place between the Trust and Mr Griffiths at the time the dispositions were made? Mr Griffiths was unaware that the investment agreements were void when he demanded the payments. He was, therefore, unaware that he had a valid claim under the *conditio*. He accordingly did not invoke the *conditio* as the basis for demanding the payments. The demands were made, and acceded to, for payment of the agreed amounts under the void investment agreements. All four payments were made within the same factual matrix. It is not open to Mr Griffiths to argue that, if he had invoked the *conditio*, the payments would have been made in the ordinary course. On a factual level, he did not do so. He demanded the full amounts due under the void investments, which happened to

---

[28] *Fourie's Trustee v Van Rhijn* (note 13 above) at 5.
[29] Per Kotze JA in *Zeeman* (note 17 above) at 174.

be paid in four, rather than two, sums. The payments, and hence the dispositions, were made by the Trust as payments due in respect of the repayment of the investments, not under the *condictio*.

[29]  If, immediately before the payments were demanded and made, Mr Griffiths had become aware of the illegality and demanded and received payment of only the capital on the basis of the *condictio*, he would have been in a different position. The business relationship between him and the Trust would then have been one arising from the *condictio*. But it is impermissible to apply an *ex post facto*, theoretical overlay to the dispositions. The 'transactions' arising from the business relationship between Mr Griffiths and the Trust at the time arose from the void agreements, not from the *condictio*.

[30]  In *Jacobson and Co's Trustees v Jacobson and Co*,[30] De Villiers AJA said the following:

> 'Now before the Court would be entitled to say that the disposition was in the ordinary course of business it would have to be satisfied that it is in possession of all the facts, for only then would it be in a position to decide whether the contracts themselves, which form the basis of the transaction, are genuine; since a delivery that rests on a contract which itself is open to question cannot be said to be a delivery in the ordinary course of business.'

The test is objective and considers whether, at the time and in the circumstances in which they were made, the dispositions gave effect to a valid underlying *causa*. The transactions in the present matter are hit by the dictum in *Jacobson*. The payments were made under the investment agreements. The dispositions must accordingly be treated on the same footing as the interest payments because they were part of the same transactions.

---

[30] Note 17 above at 79.

[31]   In my view, applying the broad, objective test to the facts of this matter, the repayments of the capital amounts did not take place in the ordinary course of business. Therefore, not only the dispositions relating to interest, but also those relating to capital, were correctly set aside. The appeal must fail.

[32]   As regards the cross-appeal, the trustees submitted that the order of the court below ought to be varied 'to allow for the payment of *mora* interest on the judgment debt, from date of service of summons to date of payment (the proper order, although not claimed, should have been interest from date of the disposition)'. They submitted that the court below erred in ordering interest to run only from the date of judgment.[31] Judgment was handed down on 25 March 2014.

[33]   The trustees based this submission on s 32(3) of the Act which reads as follows:

'When the Court sets aside any disposition of property under any of the said sections, it shall declare the trustee entitled to recover any property alienated under the said disposition or in default of such property the value thereof at the date of the disposition or at the date on which the disposition is set aside, whichever is the higher.'

The submission developed along the following lines. Property is defined in the Act as movable or immovable property.[32] This broad definition includes money. Where the actual property cannot be restored, the greater of its value at disposition and that at judgment must be restored. Where the property is money, it was submitted, '. . . the money itself can no longer be recovered (unless the money was enclosed in a receptacle or sealed in some way).' The payment of *mora* interest is ordered so as to compensate a creditor for the loss suffered by

---

[31] The prescribed rate of interest was varied from 15.5 per cent per annum to 9 per cent per annum as from 1 August 2014 (GN R554, GG 37831, 18 July 2014). Judgment was handed down in March 2014. As such, the rate of 15.5 per cent per annum applied. The rate prescribed at the time when interest begins to run governs the calculation of interest and does not vary if the prescribed rate is adjusted in the interim. *Davehill (Pty) Ltd v Community Development Board* 1988 (1) SA 290 (A) at 300G-302A.
[32] Section 2.

not receiving payment on the due date.[33] The section therefore implicitly refers to interest being recoverable on dispositions sounding in money from the date of the disposition.

[34]   In making this submission, the trustees sought to distinguish *Janse van Rensburg & others NNO v Steyn*,[34] where this court disallowed a claim for *mora* interest from the date of service of the summons. In the alternative, they submitted that *Janse van Rensburg* was wrongly decided and invited us to depart from it.

[35]   In *Janse van Rensburg* this court dealt with a prayer claiming interest *a tempore morae*.[35] The issue was when the *mora* period began to run. The concept of *mora* relates to the time at which an obligation is due. If, for example, a contract requires payment to be made by a certain date and the party required to perform it fails to do so, that party is said to be in *mora*, or breach, of that obligation. That is an example of *mora ex re* and interest *a tempore morae* would run from that date. Where a contract does not fix a time and, after a reasonable time has elapsed, one party demands payment, the demand places the debtor in *mora*. This is an example of *mora ex persona*. When that demand is made by the service of a summons, the *mora ex persona* would run from the date of service. In either instance, the debtor is not in *mora* until the payment is due. As regards unliquidated debts, the common law has been varied by s 2A of the Prescribed Rate of Interest Act.[36] This provides for interest to run from the date of demand, subject to a court's discretion.[37]

---

[33] *Bellairs v Hodnett & another* 1978 (1) SA 1109 (A) at 1145D.
[34] *Janse van Rensburg & others NNO v Steyn* [2011] ZASCA 71; 2012 (3) SA 72 (SCA).
[35] Paragraph 18.
[36] Prescribed Rate of Interest Act 55 of 1975.
[37] Section 2A(5) gives a court that discretion.

[36]  *Duet and Magnum Financial Services CC (in Liquidation) v Koster*[38] decided the issue of when an obligation to pay arises under the sections of the Act in question, albeit in the context of prescription. This court there found that the liquidators were 'entitled to have a declaration made by a court that brings a debt into existence'.[39] There is no debt in existence, and therefore no obligation to pay, until an order is made. Therefore, *Janse van Rensburg* found, no interest can run from before the date of judgment. This is because the term *a tempore morae* cannot refer to a time prior to when the debt arises.

[37]  The trustees relied on the principle articulated in *Bellairs v Hodnett and another*,[40] to the following effect:

'It may be accepted that the award of interest to a creditor, where his debtor is *in mora* in regard to the payment of a monetary obligation under a contract, is, in the absence of a contractual obligation to pay interest, based upon the principle that the creditor is entitled to be compensated for the loss or damage that he has suffered as a result of not receiving his money on due date . . .'.[41]

But this does not apply to debt under s 29 of the Act. In *Bellairs*, the debtor was in *mora* prior to judgment. In such a case, a creditor would suffer a loss if interest were not to run from due date to date of judgment. Put simply, however, in the present matter, the due date is the date of judgment. If interest runs from that date, the loss envisaged in *Bellairs* cannot be suffered.

[38]  The trustees contended that *Janse van Rensburg* was wrong in its finding that 'the ordinary incidence of demand by means of service of the summons giving rise to *mora ex persona* must yield to the effect' of s 32(3) of the Act.[42] All that this means, however, is that demand by service of a summons in an

---

[38] *Duet and Magnum Financial Services CC (in Liquidation) v Koster* 2010 (4) SA 499 (SCA).
[39] *Duet and Magnum* para 13.
[40] Note 32 above.
[41] Ibid at 1145D-F.
[42] Paragraph 20.

action to set aside a disposition under one of these sections does not give rise to *mora ex persona*. This is because, as was explained in *Duet and Magnum*, the debt only comes into being at the time of a court's declaration to that effect. The debt is not one arising from contract or delict. It is a statutory debt. A demand does not place the person to whom a disposition has been made in *mora* since there is, at the time of demand, no debt to enforce and no payment due. *Janse van Rensburg* explained that 'the debtor is in *mora* only from date of judgment.'[43] Far from the finding in *Janse van Rensburg* being clearly wrong, it was, in my respectful view, entirely correct.

[39]   The trustees went on to submit that, in *Janse van Rensburg*, this court should have found that the section '. . . implicitly enjoins a court to order the payment of interest on restored monies in respect of an impeached transaction as from the date of the disposition.' This submission rests on the assertion that money must have lost value between the date of disposition and the date of judgment. But this confuses two situations. The first claims '*mora* interest on the judgment debt, from date of service of the summons'. This is what was relied on by the trustees and has been dealt with above.

[40]   The second situation would arise where judgment is claimed in an amount exceeding the amount of the disposition because of a reduction in the value of money between the date of disposition and the date of judgment. It is clear that the object of s 32(3) is to ensure that the property brought back into the estate for the benefit of creditors has not diminished in value. It may be that a case could be made out for an increased award in certain circumstances where money forms the disposition. Judgment could then be granted for payment of a higher amount. Interest would run on that higher amount from date of judgment according to the principle in *Janse van Rensburg*. But the trustees did not

---

[43] Ibid.

contend for this at the trial or on appeal. Whether such a case can be made out, and the correctness of the reasoning of the trustees referred to in paragraph 32 hereof, must therefore be left for decision at a time when these issues arise squarely. No finding on them can be made in this matter. The cross-appeal must therefore be dismissed with costs.

[41]   The following order is made:

1 The appeal is dismissed with costs.

2 The cross-appeal is dismissed with costs.

_____

**T R Gorven**
**Acting Judge of Appeal**

_____

**JUDGMENT**

_____

**Petse JA (dissenting)**

[42]   I have had the privilege of reading the judgment of Gorven AJA. On most of his views I am in respectful agreement. I, too, agree that the cross-appeal must fail for the reasons that he gives. But on some other issues relating to the main appeal I respectfully disagree with my learned colleague. Regrettably, our differences of opinion lead to divergent results.

[43]   In what follows I deal with the points of disagreement. The facts of this case have been summarised in the judgment of my learned colleague and will not be repeated in this judgment save to the extent necessary to promote a better understanding of this judgment.

[44]   In his judgment, Gorven AJA readily accepts (in para 24 above): (a) that there was no evidence that the appellant had acted *ex turpi causa* or had knowledge that the investments were somehow tainted, hence the question of the relaxation of the *par delictum* rule did not apply; (b) that had the appellant made his claims under the *condictio*  such claims would have been enforceable in relation to the capital amounts invested in the scheme; and (c) that had the payment to the appellant been made in a single transaction a claim under the *condictio* would not have been enforceable. And, despite the fact that the Trust paid the interest separately from the payment of the capital amounts the appellant could not succeed because all the payments made to him by the Trust were made pursuant to the underlying agreements. Consequently, Gorven AJA holds that the appellant could not, long after those payments were made, seek to rely on the *condictio* for to do so would have the effect of avoiding 'the true basis upon which the payments were actually made'. (Para 28-30 above.)

[45]   Put differently, my learned colleague considers that since the appellant was not aware that his investment agreements with the Trust were void, it was not open to him *ex post facto* to fall back on the *condictio* when in actual fact he had demanded 'the full amounts due under the void investments' and not under the *condictio*. For this conclusion my learned colleague relies on *dicta* in some decisions of our courts which he cites in support of his finding.[44] (Para 27 and 29 above.)

---

[44] *Fourie's Trustee v Van Rhijn* 1922 OPD 1 at 5; *Jacobson and Co's Trustees v Jacobson and Co* 1920 AD 75 at 79.

[46]   On the basis of the passages cited by my learned colleague he concludes that on the facts of this case, the repayments of the capital amounts to the appellant were not made in the ordinary course of the business of the insolvent Trust. With respect I find myself unable to subscribe to this view. On the facts of this case, I cannot discern anything which suggests that the two payments made in respect of the capital amounts invested with the Trust were not made in the ordinary course of the business of the Trust. And, there is, in my view, nothing that suggests that 'the contracts themselves, which form the basis of the transactions', are not otherwise 'genuine'. Nor can it be said that the dispositions 'rest[ed] on a contract which itself is open to question'. It is after all trite that in applying the 'ordinary-course-of-business' test, a court must have regard not only to the terms of the disposition itself but also to the circumstances in which such disposition was made. (See for example in this regard *Pretorius' Trustee v Van Blommenstein* 1949 (1) SA 267 (O) at 273 and 277.)

[47]   Both in this court and the court a quo the appellant heavily relied on *Gazit Properties*[45] in contending that the two payments representing the capital amounts were made in the ordinary course of business. There this court held that the fact that Malokiba (that is the insolvent) had conducted the business of a bank in contravention of s 11(1) of the Banks Act 94 of 1990 did not taint the loan agreements. It went on to state that Gazit Properties 'was vested with a contractual right to be repaid as soon as it cancelled the loan agreements. . . ' and that Malokiba 'concomitantly had a contractual obligation to make the payment'. And that the fact that Malokiba had 'contravened the [Banks] Act [did] not mean that the loan agreements were not normal agreements. . .'

---

[45] *Gazit Properties v Botha & others NNO* [2011] ZASCA 199; 2012 (2) SA 306 (SCA).

[48]   How then, it may be asked, could the appellant be expected to invoke the *condictio* when he demanded payment if he was unaware of the illegality of the business conducted by the Trust? He would surely not have been aware that (to borrow the phraseology adopted in the majority judgment) 'the "transaction" arising from the business relationship between [the appellant] and the Trust at the time arose from void agreements, [and] not from the *condictio*'. In my view the fact that the appellant 'misconceived' the nature of his *causa* in making demand for repayment of the investment amounts is understandable for, as I have already stated, he was not aware at that stage that his agreements with the Trust were void.

[49]   I am fortified in this view by what was stated by this court in *Fourie NO v Edeling NO* [2004] ZASCA 28; [2005] 4 All SA 393 (SCA) para 13:
'The scheme never had the least entitlement to retain investors' money until the date which had supposedly been agreed as the due date for repayment. The perpetrators of the scheme knew the investments to be illegal. There is, on the other hand, no evidence that any of the investors knew their investments to be tainted, nothing from which to infer that any of them acted *ex turpi causa.* That being so, no question arises of relaxing the [*par delictum*] rule. . . <u>Upon receipt of a payment the scheme was liable promptly to repay it to the investor who had a claim for it under the *condictio ob iniustam causam.*</u>'[46] (My emphasis.)

[50]   Although these remarks were made in the context of a consideration of s 30(1) of the Insolvency Act 24 of 1936, they apply, by parity of reasoning, with equal force to the facts of this case. The Trust upon receipt by it of the payments made by Mr Griffiths, 'was liable promptly to repay' to him such moneys under

---

[46] This dictum was applied in *Gazit Properties* (above) para 11.

the *condictio ob iniustam causam* in respect of which he had a claim.[47]    It is also instructive that in *Gazit Properties*, whose facts are comparable to the facts of this case, this court said the following:

'Gazit was entitled, had it become aware of the misrepresentation to cancel the contracts. But until cancelled, [they] remained valid and enforceable and payment in [their] terms (especially by the guilty party) could never be regarded as not being in the ordinary course of business.'[48]

[51]    Accordingly I would uphold the appeal with costs. As already stated at the outset I am in respectful agreement with the order relating to the cross-appeal.

_____

X M Petse
Judge of Appeal

---

[47] De Groot *Inleidinge* 3.1.15 (see also *D* 50.17.206); *Pucjlowski v Johnston's Executors* 1946 WLD 1 at 6; see also *Wilken v Kohler* 1913 AD 135 at 145; Daniel Visser *Unjustified Enrichment* (2008) at 16-24 and 85-90; J C Sonnekus *Unjustified Enrichment in South African Law* (2008) at 27; Jacques du Plessis *The South African Law of Unjustified Enrichment* (2012) at 1-3.
[48] Para 13.

APPEARANCES:

| For Appellant: | E A S Ford SC |
| | Instructed by: |
| | Pagdens Attorneys, Port Elizabeth |
| | McIntyre & Van der Post, Bloemfontein |

| For Respondents: | S C Rorke SC (with him O R Ronaasen) |
| | Instructed by: |
| | De Villiers Inc, Port Elizabeth |
| | Christo Dippenaar Attorneys, Bloemfontein |